**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

**JANE DOE and JOHN DOE,
ATTORNEY-IN-FACT for A.T.
    Plaintiffs;**

**v.**

                                    **CIVIL ACTION NO. 4:21-cv-03728**

**TEXAS A&M UNIVERSITY,
    Defendant.**

### PLAINTIFFS' ORIGINAL COMPLAINT

COMES NOW, JANE DOE and JOHN DOE, jointly with a Durable Power of Attorney executed by A.T., and operating as her Attorney-In-Fact ("Plaintiffs" herein), and files this their *Original Complaint* arguing that the Texas A&M University ("TAMU" or ("Defendant" herein) violated the rights of A.T. as more specifically pled herein.  Plaintiffs reserve the right to re-plead if new claims and issues arise upon further development of the facts, as permitted by law and this Court. In support thereof, Plaintiffs respectfully show this Honorable Court as follows: and would show the Court as follows:

### I.  STATEMENT OF THE CASE

1.      A.T. was born in 2000[1] and was born with Down Syndrome.  As such, and related to that syndrome has related distinct physical characteristics, cognitive or intellectual disabilities and deficits in important social skills[2].  The TAMU has developed a college level program for students like A.T. called the Aggie ACHIEVE Program.   While well-intentioned

---

[1].  Initials are used throughout the complaint to protect A.T.'s identity as well the identities of other students with disabilities.

[2].  A.T. has Down Syndrome f/k/a Mental Retardation.

unfortunately the Program had some design defects.  For instance, it failed to provide her the additional supervision she required as compared to her non-cognitively disabled peers. In a related vein, the Defendant also knew that staff serving A.T. required additional training due to her unique and individualized needs but failed to provide that also.  Further, because of both the needs of A.T. and the staff serving A.T., the TAMU had a further duty to more diligently supervise staff, but they failed to do this also.  Not surprisingly A.T. became a victim of bullying and harassment, and later sexual assault.

2.      Based upon these and the other various failures of the TAMU more fully described below, A.T. brings  forth this complaint alleging the TAMU violated her rights pursuant to Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 USC §794; the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12131 et seq.; Title IX of the Education Acts of 1972 ("Title IX"), 20 U.S.C. §1681 et seq. and the United States Constitution pursuant to 42 U.S.C. §1983.

## II.  JURISDICTION

3.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §1331 and 1343 because the matters in controversy arise under the constitution and laws of the United States.

## III.  VENUE

4.      Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiffs' claims occurred in the Southern District of Texas, Houston Division.

## IV.  PARTIES

5.      A.T.  curently lives with her parents Jane and John Doe in the Houston, Texas area.

Original Complaint                                                                                            2

6.      The Defendant Texas A&M University (TAMU) is a state and federally funded public university responsible for oversight, rulemaking, compliance with state and federal law, and control of programs offered by TAMU and staff and students leading, administering, teaching and otherwise supporting such programs. TAMU conducts its principal operations at Moore/Connally Building, 301 Tarrow Street, College Station, Texas, 77840-7896.   The Honorable Ray Bonilla, Attorney is the General Counsel for TAMU and is its registered agent for service of process.  Plaintiffs reasonably believe that Counsel will accept and/or waive service.

## V.  FACTUAL BACKGROUND

A.      ABOUT A.T.

1.      A.T. was born in 2000.  She is a person with Down Syndrome[3] and has also been diagnosed with hypothyroidism, a slight heart defect.  While she is now twenty-one (21) years old she appears to be closer to fourteen (14) or fifteen (15) years old.  A.T.'s intellectual disability ("ID") requires she be given various accommodations, supports and interventions at home, in the community and at school.[4]   Her hearing and eyesight are both normal with glasses. From her pre-kindergarten through 12th grade school years, A.T. qualified for Special Education Services pursuant to the *Individuals with Disabilities Education Act* ("IDEA") and

---

[3].  Down syndrome is a genetic disorder caused by the presence of all or part of a third copy of chromosome 21. It is usually associated with a weakened immune system, small stature, poor muscle tone, physical growth delays, mild to moderate intellectual disability, and characteristic facial features causing somewhat slanted eyes, a somewhat flattened forehead and nasal bridge. Commonly persons with Down Syndrome understand language better than they themselves can speak but have limitations in expressing their feelings appropriately, if at all.   The average IQ of a young adult with Down syndrome is 50, equivalent to the mental ability of an eight- or nine-year-old child, but this can vary widely. https://en.wikipedia.org/wiki/Down_syndrome .

[4].  Early testing evidenced A.T.'s IQ at significantly over 55.  While some of her adaptive behaviors are closer to the 70 range her physical appearance is almost pubescent and her age related social skills are somewhat "childish."

had what is termed an *Individual Education Plan* ("IEP") based upon the ID designation and by way of having a speech impairment. Her IEP provided a number of accommodations and modifications for her educational programming and environment. These accommodations permitted her to be educated with her non-disabled peers in the same classroom environment which included among other things "a watchful eye by staff" and behavioral supports. Like many of her peers she wanted to attend college.

B.     ABOUT TEXAS AGRICULTURE & MARITIME UNIVERSITY

2.     Texas A&M University ("TAMU")[5] is a public land-grant research university in College Station, Texas. It was founded in 1876 and became the flagship institution of the Texas A&M University System in 1948. As of 2020, Texas A&M's student body is the second largest in the United States. Texas A&M is the only university in Texas to hold simultaneous designations as a land, sea, and space grant institution. It has projects funded by organizations such as the National Aeronautics and Space Administration (NASA), the National Institutes of Health, the National Science Foundation, and the Office of Naval Research.

3.     The main campus is one of the ten largest in the United States, spanning 5,200 acres (21 km2) and is home to the George Bush Presidential Library. About one-fifth of the student body lives on campus. Texas A&M has more than 1,000 officially recognized student organizations. Many students also observe various university traditions, which govern daily life, as well as special occasions, including sports events. Working with various A&M-related agencies, the school has a direct presence in each of the 254 counties in Texas.

---

[5]. https://en.wikipedia.org/wiki/Texas_A&M_University

The university offers degrees in more than 150 courses of study through ten colleges and houses 18 research institutes. As a Senior Military College, Texas A&M is one of six American public universities with a full-time, volunteer Corps of Cadets who study alongside civilian undergraduate students.

C.     ABOUT DISABILITY RESOURCES, DIVISION OF STUDENT AFFAIRS

4.     As a public university receiving federal monies TAMU must follow the requisites of Section 504 of the Rehabilitation Act of 1973 ("Section 504"), the Americans with Disabilities Act ("ADA"), Title IX of the Education Acts of 1972 ("Title IX") and of course the United States Constitution.  Accordingly, the TAMU has a specialized program called *Disability Resources* which is part of the "Division Of Student Affairs."

5.     Aside from the usual accommodations a public entity must provide, like parking, or curb cuts for example or BRAILLE in public areas, all for persons with disabilities in the general community, TAMU has a more specified duty to develop what is termed a *Section 504 Accommodation Plan* for eligible students.  Based upon the type of disability in general and the needs of the student specifically, accommodations can be quite varied.

6.     For instance, in just addressing the needs of a student who is vision-impaired the TAMU must consider what is termed Assistive Technology.  This includes but is not limited to audio books, adaptive hardware and software, textbook scanning, alternative print formats, including larger font, BRAILLE, electronic text and audio books mentioned above.  The adaptive software and hardware can be a screen reader and/or magnifier, voice recognition software, adaptive mice and/or keyboards and adjustable desks or chairs. For students are hearing impaired there may be sign language interpreting services, transcription assistance

and amplified listening systems.  It can even include a personal attendant if a student needs help getting around campus, toileting or fully accessing classroom services.  For students with personal needs there may be offerings of extensive psychological and counseling support services. The types of disabilities are multiple and the lists of accommodations is endless.

7.     In any case, to benefit for such a plan, as a general rule the student must request *Disability Resources* to develop a very individualized *Accommodation Plan* for the requestor.  Of course, if the disabling condition is self-evident like a student in a wheelchair or with crutches, or one who is blind the duty falls on TAMU to be more proscriptive.  This *Accommodation Plan* is intended to assure that eligible students receive individualized accommodation and/or modifications so that the student can benefit from educational and non-educational services to the same extent as one's non-disabled peers.

D.     TITLE IX OFFICER

8.     The TAMU has a designated Title IX Officer to provide oversight to the University's compliance with Title IX mandates.   Among other things the office addresses and investigates allegations bullying and harassment based upon sex and gender, including and especially sexual assault.  It's goal is provide a safe and respectful academic, working and living environment for member of the University Community.  The Title IX Office supports a number os programs for the community including for instance, a four hour self-defense class for women taught by the University Police, what is termed a "STAND Up Workshop" to train students about processing a traumatic event, Wellness Presentations to promote mental and physical health, "Green Dot" Bystander Intervention Training and "Sexual

Assault Prevention Training."    There is no specific identification within the Title IX Program to address the needs of students with disabilities or if in the Aggie ACHIEVE Program

E.    CAMPUS LIFE

9.    The TAMU has a "Department Of residence Life" which address dormitory life for students. It covers a number of important topics, most relevant to A.T., issues of health and safety, conduct, related rules and responsibilities and the process to address rule infractions. Whether te alleged infractions be considered minor or even major the student who is the object of a complaint is given written material about the complaint and ability to defend herself. She may be assisted by an advisor but the advisor cannot actively participate.   There is no specific identification within the Campus Life Program and complaint process that addressed the needs of students with disabilities like A.T., or students in the Aggie ACHIEVE Program, where among many things, the role of an advisor is integral to the fundamental fairness of the process. .

F    ABOUT THE AGGIE ACHIEVE PROGRAM

10.    In 2008 the federal government passed the Higher Education Opportunity Act intended to create higher education opportunities for individuals with intellectual and developmental disabilities.   The TAMU developed the Aggie ACHIEVE's foundation to help effectuate legislative intent.  The Aggie ACHIEVE (Academic Courses in Higher Inclusive Education and Vocational Experiences) Program is a four-year comprehensive transition program for young adults with intellectual and developmental disabilities who have exited high school. Aggie ACHIEVE provides an inclusive and immersive college education and equips students

like A.T. for employment in the community. Aggie ACHIEVE aligns coursework, internship opportunities, and extracurricular activities with each student's academic interests and employment goals. Students reside in Texas A&M residence halls and have access to all campus-related activities. Aggie ACHIEVE students graduate with a Certificate in Interdisciplinary Studies from Texas A&M University.  It has lofty and well-intentioned goals.

11.     There are a number of trends unfolding on college campus across the country.  First, more and more students with cognitive and intellectual disabilities are going to college.  Second, colleges are doing more and more training on reporting sexual harassment and assault.  Third, these student with disabilities who notoriously have poor social skills, especially young men, have a very difficult time navigating social relationships and their own emerging sexuality and disproportionately get in trouble.  Notwithstanding these well documented and discussed trends the TAMU does not apparently have any specific Title IX related training for students in the Aggie ACHIEVE Program.  Nor does it have any formal relationship with the *Disability Resources* office regarding human sexuality related training for students like A.T.

G.      A.T. ENTERS THE AGGIE ACHIEVE PROGRAM

12.     While it is true that A.T. has Down Syndrome and the related Intellectual Deficiencies she too wanted to attend college like her siblings and friends at school.  There are programs across the United States for students like A.T. including the College of Charleston "Reach Program," Framingham State University "Diverse Scholars Program," St. Vincent College B.E.S.T. Program," University of Iowa "Reach Program."   When her parents learned about

the Aggie ACHIEVE program just down the road from their home in the Fort Bend area, simply put "they were all in."

13.     In a and around April 5, 2019, A.T. along with her parents attended a TAMU campus visit and an Aggie Achieve interview.  While A.T. met separately with some staff so did her parents who met with Dr. Carly Gilson, Founder and Faculty Director of the program. At that time, parents expressed concerns and raised some issues related to the program generally and A.T. specifically around use of free time, supervision in and around the dormitories and campus safety.

14.     A.T.'s parents well-understand that TAMU does not have to provide an *Individualized Educational Plan* under the IDEA like their daughter received in high school but now knows that the TAMU does have a duty to develop and provide a *Section 504 Accommodation Plan* for A.T.  However there was none contemplated  Based upon actual parental requests such a plan should have considered and included, among many things, transportation issues across campus, meal planing, physical exercise, use of free time, social skills training especially with males, behavioral support interventions and extracurricula activities like theater and acting that A.T. had enjoyed and benefitted from in high school.

15.     Aside from providing A.T. and other Aggie ACHIEVE Students a contact person called a *Residential Mentor* no other accommodation, whether formal as a 504 Accommodation Plan or informal under some other characterization was provided.  None at all.  Mother and father brought their concerns about this failure to have a formal plan for A.T. to the staff attention at that time but to no avail.   Nevertheless A.T was excited about attending college and her parents were supportive and remained hopeful that staff would address A.T.'s needs.

16.     On or about August 12th 2019, A.T. and her parents met the recently hired Aggie Achieve

        Program Director, Dr. Olivia Hester for the first time.  At this meeting A.T.'s parents again

        very specifically asked her how Aggie ACHIEVE students in general and how their daughter

        in particular would be provided accommodations to benefit from the college experience.

        They verbalized their particular concerns that planned supports and supervision was

        insufficient for A.T. and other students in the dorm.  Further, based upon the TAMU students

        that they met with, that training for staff, including and especially for the *Residential Mentor*

        who was to supervise A.T. and others, was woefully insufficient.

H.      THE FALL 2019 SEMESTER

17.     A.T. entered Aggie ACHIEVE in the Fall of 2019 with high hopes but no individualized

        Section 504 Accommodation Plan even though one was obviously required.  Moreover, the

        concerns brought up by A.T.'s parents about deficiencies in the program also went

        unanswered.  The  Aggie ACHIEVE Program while having some wonderful attributes had

        at its core some major systemic problems, including staff being insufficiently trained on

        Down's Syndrome and the related unique needs of that person, of staff being sufficiently

        trained in supervising a group of students with Intellectual Disabilities like A.T. and the

        failure of the administration to supervise the supervisors.  There a paucity of attention spent

        on human sexuality issues for students with cognitive disabilities and the unique needs of

        A.T. in particular. It was quite frankly, "an incident waiting to happen" and it did.

18.     The regular dormitory rule and behavioral requirements did not contemplate students in the

        Aggie ACHIEVE program or student with Down Syndrome like A.T. in particular.  Over the

        course of time all the problems noted above became evident especially as to dormitory life

Original Complaint                                                                                    10

at the White Creek Student Housing. The situation between A.T. and some of her dorm mates, C.O. in particular was deteriorating.  C.O. was much, much bigger than A.T., less cognitively impaired, more verbal and more socially skilled.   A.T. became fearful and she, and her mother expressed those fears to the program director but that person did not address the issue.  She did not understand she could file a complaint against O.C.

19.     A.T. started to become anxious and also depressed.  She started to struggle to awaken on time for early classes.  She even told the Program Director, Dr. Olivia Hester she was suicidal.  Hester also failed to address A.T.'s emotional deterioration, help her access psychological services or a counselor, contact DISABILITY RESOURCES, help facilitate the initiation of a long-overdue Section 504 Accommodation Plan or anything for that matter. Nor did anyone investigate concerns A.T. was a victim of bullying and harassment.

20.     Things between A.T. and O.C. worsened with another student with Down Syndrome, L.V., caught in the middle.  In fact, A.T. and L.V. had been friends for many, many years in the Houston area.  In any case, on at least on one occasion O.C. yelled at A.T. and then shoved her.  Not surprisingly the harassment between O.C. upon A.T. exacerbated A.T.'s anxiety. Even worse, the long-term friendship between A.T. and L.V. started to unravel.  Fearful of losing her best friend, A.T. attempted to communicate with L.V. herself.  The *Resident Monitor* was ill-equipped to address the problem or refer the problem to her supervisor. On or about November 11th,  A.T. was with L.V. and made a video that harkened back to a game played between A.T. and her high school friends based upon a theatrical play.

21.     The next day A.T. was watching the video, thought it was funny and another ACHIEVE student observed it, but did not see the humor and instead thought A.T. was threatening L.V.

That student reported her concerns to Dr. Hester, who initiated the regular TAMU Disciplinary Proceedings for Dormitory infractions. A.T. was automatically suspended from school for violating the regular School Code of Conduct.

22.    Administration sent A.T. information about the disciplinary process, the claims against her and papers she was required to sign. Of course, she did not understand them. Nor did TAMU appoint someone to assist A.T. in understanding what happened to her and why she removed from school and the dorm. In fact, when her parents later learned about the suspension, the TAMU refused to even permit them to formally advocate or assist their daughter in any meeting.

23.    By then A.T. was forced to leave the White Creek Dormitory, also pursuant to regular disciplinary procedures. At that time the Aggie ACHIEVE Program did not have a modified Dormitory Infraction Policy or Disciplinary Policy for Aggie ACHIEVE Program Students. Importantly, because there was no 504 Accommodation Plan in place for A.T. there was no roadmap on how to deal with her unique and individualized needs during the entire disciplinary process.

24.    Late in the fall of 2019 the regular disciplinary process did not uphold the suspension but also did not permit her to return to the dorm with all the other Aggie ACHIEVE Students. Rather she was sent to the Gardens Apartment by herself. Unlike the previous dorm, the Garden Apartment was not within walking distance to a cafeteria where A.T. could use her meal plan ticket. The apartment and nearby bus stop were far away from her then familiar campus spots. A *Resident Monitor* was on site but was never there. A.T. had no food in her

apartment and no way to get food.  She spent much of her time in the room alone.  She was forgotten by the Program Administrators.

25.     After multiple complaints by A.T.'s parents TAMU agreed to modify the Aggie ACHIEVE Dorm Infraction and general Disciplinary Policy to better address the needs of all ACHIEVE Students including A.T.  In those discussions A.T.'s parents continued to relate concerns about supervision and training for staff.

26.     By early March of 2020 the COVID-19 Pandemic affected the entire country.  A.T. went home to live with her family and took classes remotely over the next few semesters.  She secured an Internship during this period.  The Plan was for her to return to TAMU for the Fall 2021 semester.   The hope was that after the problems in the first semester the supervision of students would be enhanced, that the training for the *Resident Monitors* and other staff associated with the program would also be improved.  It was not.

I.      THE FALL 2021 SEMESTER

27.     On September 14th a male student N.M. followed A.T. into coming into her White Creek dormitory bedroom. N.M. did not ask A.T.'s permission to have sex with her and nor she ever agree.  Rather he took advantage of A.T. having Down Syndrome, her passive nature and lack of any supervision at all and N.M. sexually assaulted her. He bragged about the encounter to his friends M.M.. and J.E. On the next evening, and after curfew, J.E. and M.M. also manipulated A.T. into visiting their room where another student, N.M. was present.  As it was late A.T. fell asleep but awoke when J.E. started to sexually assault her.  She asked him to stop many times but he would not.  The next day she reported the rape.

Original Complaint                                                                                          13

28.   Upon reason and belief, Plaintiffs do not believe the young men who harassed and later raped A.T. had any special training on human sexuality and sexual harassment commensurate with their own disabilities.  These and other failures created a hostile educational for A.T.

## VI. STATE ACTION

29.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

30.   The Texas A&M University in any capacities and in all matters, acted under color of state law when it permitted Plaintiff to be subjected to the wrongs and injuries set forth herein.

## VII. UNCONSTITUTIONAL POLICIES, PROCEDURES, PRACTICES & CUSTOMS

31.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.  Moreover, each paragraph below incorporates be reference the one above it.

32.   During the relevant time period contemplated by this cause of action, the Texas A&M Defendant had an actual practice and custom of conscious and deliberate indifference to the federal law, federal rules, directives from federal executive agencies and their own University Policies and Procedures in regard to the treatment of A.T.  First and as noted above, this Defendant obviously has failed to train staff in regard to the laws, regulations, directives and their own policies and procedures related to Section 504 of the Rehabilitation Act of 1973, the Americans With Disabilities Act and Title IX of the Educational Acts of 1972 both individually and in concert with each other.  Second and in a related vein, the Texas A&M Defendant failed to correctly supervise staff in regard to the unique and individualized needs of A.T.  And in addition, to the young men that sexually assaulted her.

Further, and in addition to the above, that such failures rise to the level of a violation of the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

## VIII. CLAIMS PURSUANT TO THE AMERICANS WITH DISABILITIES ACT

33.    In addition and in the alternative to the above, the facts as previously described demonstrate that the Defendant also violated A.T.'s rights as contemplated by the *Americans with Disabilities Act*, 42 U.S.C. §12131, et seq ("ADA").

34.    A.T. is a "qualified individual with a disability" as defined in 42 U.S.C. §12131(2) having a cognitive disability that affects a major life function, including learning, behaviors, socialization needs with others.

35.    The Texas A&M Independent School District is a "public entity" as defined in 42 U.S.C. §12131(1), and receives federal financial assistance so as to be covered by the mandate of the ADA.

36.    The Defendant's facilities and their operation constitute a program and services for ADA purposes.

37.    Specifically, and separate and apart from his Section 504 cause of action related below, A.T. alleges that the Defendant failed and refused to reasonably accommodate and modify the services she needs due to her disability, in violation of Title II of the ADA.

38.    In addition and in the alternative, A.T. was also victim of discrimination based upon disability because the TAMU Defendant failed to provide her, and the Aggie ACHIEVE male students who sexually assaulted her, appropriately modified human sexuality education, which taken together created an unsafe and hostile educational environment for A.T.

## IX. <u>CLAIMS PURSUANT TO THE REHABILITATION ACT OF 1973</u>

39.   In addition and in the alternative to the above, the facts as previously described demonstrate that the Defendant also violated A.T.'s rights as contemplated by the Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794.

40.   The Texas A&M University receives federal funds and thus must follow the requisites of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794.

41.   The implementing regulations of Section 504 require that each State that receives disbursements, including the state's political subdivisions such as the Texas A&M University must ensure all students with disabilities are given appropriate and necessary accommodations, pursuant to federal law and rules. To the degree that a policy or practice hinders honest consideration of a disabled student's unique and individualized needs, and fails to accommodate that child's disability and keep the student safe, it violates Section 504.

42.   A.T. asserts that because the Defendant failed to provide her a safe and non-hostile educational environment, such failures as noted above, have together and separately, contributed to violating her rights pursuant to Section 504, and the federal rules and regulations promulgated pursuant thereto.

43.   Further, and also in addition and in the alternative to the above, she was also a victim of disparate impact under Section 504, by the acts and omissions of the Defendant.

44.   Last, and likewise, also in addition and in the alternative to the above, A.T. was thus a victim of discrimination based upon disability by the Defendant similar to the ADA claim noted above.

## X.  <u>TITLE IX OF THE EDUCATIONAL ACTS OF 1972</u>

45.     The Educational Acts of 1972 passed through Congress as Public Law No. 92-318, 86 Stat. 235 (June 23, 1972) and codified at 20 U.S.C. sections 1681 through 1688.  It is commonly known as "Title IX" and states (in part) that:

> "No person in the United States shall, on the basis of gender, be excluded from participation in, be *denied the benefits of*, or be *subjected to discrimination* (emphasis added) under any education program or activity receiving federal financial assistance."

46.     Here A.T. was victim of discrimination based upon her sex or gender because the Defendant failed to address allegations she previously had been a victim of bullying and  harassment which created a hostile educational environment for her on the basis of her sex and gender, violating her rights under Title IX thereby.

47.     Also, A.T. was victim of discrimination based upon her sex or gender because the Defendant's inadequate policies evidencing a lack of training and support for students with ID (and/or mental retardation), and its inadequate supervision of Aggie ACHIEVE students created an unsafe and hostile educational environment which made A.T. more vulnerable and susceptible to sexual assault and harassment.

48.     In addition and in the alternative, A.T. was also victim of discrimination based upon her sex or gender because the Defendant failed to provide her, and the Aggie ACHIEVE male students who sexually assaulted her, appropriately tailored human sexuality education, which taken together created an unsafe and hostile educational environment which made A.T. more vulnerable and susceptible to sexual assault and harassment.

49.     In addition and in the alternative, and moreover, such failures, individually and in concert with each other caused A.T.  to be sexually assaulted by male students.

## XI.  RATIFICATION AND RESPONDEAT SUPERIOR

50.     The Texas A&M Defendant ratified the acts, omissions and customs of University personnel and staff causing violation of A.T.'s rights under the constitution and the above-referenced civil rights laws.

51.     Additionally, the Texas A&M Defendant is responsible for the acts and omissions of staff who violated the civil rights of A.T.

## XII.  PROXIMATE CAUSE

52.     Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

53.     Each and every, all and singular of the foregoing acts and omissions, on the part of the Defendant, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XIII.  DAMAGES

54.     As a direct and proximate result of the Defendant's conduct, A.T. has suffered injuries and damages, for which she is entitled to recover herein including but not limited to:

a.      Loss of equal access to educational opportunities;

b.      Physical pain in the past;

c.      Medical expenses in the past;

d.      Mental anguish in the past;

e.      Mental anguish in the future;

f.      Mental health costs in the past;

g.      Mental health costs in the future;

h.      Physical impairment in the past;

i.      Educational services to be paid in the future; and

j.      Reimbursement of past and future out-of-pocket expenses incurred by the family of

A.T.,  but for the acts and omissions of the Defendant.

## XIV. ATTORNEY FEES

55.     Plaintiffs incorporate by reference all the above related paragraphs, as if fully set forth herein.

56.     It was necessary for Plaintiffs to retain the undersigned attorneys to file this lawsuit. Upon

judgment, Plaintiffs are entitled to an award of attorney fees and costs pursuant to Title IX,

and 42 U.S.C. §2000d et seq. and 42 U.S.C. §1988.

## XV. SPOLIATION

57.     Plaintiffs hereby require and demand that the Texas A&M University Defendant preserve

and maintain all evidence pertaining to any claim or defense related to the assault or other

violations that make the basis of the complaint and the damages resulting therefrom,

including statements, photographs, videotapes, audiotapes, surveillance, security tapes,

business or medical records, incident reports, telephone records, emails, text messages,

electronic data/information, and any other evidence regarding the violations set forth herein.

58.     Failure to maintain such items will constitute "spoliation" of evidence, which will necessitate

use of the spoliation inference rule- an inference or presumption that any negligent or

intentional destruction of evidence was done because the evidence was unfavorable to the

spoliator's case.

## XVI. DEMAND FOR JURY TRIAL

59.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues

in this matter.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray for judgment against the

Defendant in the manner and particulars noted herein and above, and in an amount sufficient to fully

compensate them for the elements of damages noted herein and above, judgment for damages,

recovery of attorney's fees and costs for the preparation and trial of this cause of action and for its

appeal if required, together with pre- and post- judgment interest and court costs expended herein,

and for such other relief as the Court deems just and proper whether it be at law, or in equity or as

to both.

Respectfully submitted,

/s/ Martin J. Cirkiel
Mr. Martin J. Cirkiel, Esq.
State Bar No.: 00783829
Fed ID No.  21488
marty@cirkielaw.com [Email]

Ms. Holly Terrell, Attorney
State Bar No.: 24050691
Fed ID No.:    1034278
holly@cirkielaw.com [Email]

CIRKIEL LAW GROUP, P.C.
f/k/a Cirkiel & Associates, P.C.
1901 E. Palm Valley Boulevard
Round Rock, Texas  78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]

Sarah A. Brown, Esq.
Missouri State Bar No.: 37513
sarah@brownandcurry.com [Email]
BROWN & CURRY, LLC
1600 Genessee Street, Suite 956
Kansas City, MO 64102
(816) 756-5458 [Telephone]
(816) 666-9596 [Facsimile]

ATTORNEYS FOR PLAINTIFFS